OPINION
KAREN NELSON MOORE, Circuit Judge.
Petitioner Amadou Tidiane Soumare (“Soumare”) seeks review of an order of the Board of Immigration Appeals (“BIA”) removing him to Mauritania. The Immigration Judge (“IJ”) found that Soumare was not credible and was ineligible for asylum, withholding of removal, and relief under the Convention Against Torture. The BIA affirmed and adopted the reasoning of the Id’s decision. For the reasons discussed below, we DENY the petition for review of the BIA’s decision.
I. BACKGROUND
Soumare, a native and citizen of Mauritania, was born in Nouadhibou, Mauritania, in 1972. A black Mauritanian of the Soninke ethnic group, Soumare lived with his family in Mauritania until 1989.[1] In 1989, he and other family members, along with other black Mauritanians in the neighborhood, were forcibly removed from their home by armed police and other White Moors. They were held at a mosque overnight, then taken to the airport and transported to neighboring Senegal.[2] The IJ generally credited this testimony and called it “a matter of historical record that large numbers of black Mauritanians in the period beginning around 1989 were forcibly deported from the country.” J.A. at 28 (IJ Dec. at 14). Soumare stayed with his family at a refugee camp in Daga-na, Senegal, for around two weeks and then went to Dakar, Senegal, while the rest of his family remained at the camp.
*77 In March 1996, Soumare’s father left the refugee camp in Senegal and returned to Mauritania in an attempt to reclaim the family’s house in Nouakchott, which had been confiscated. One week later, Sou-mare learned from a sister living in Nouakchott that after returning his father had been arrested, tortured, and was now in a hospital in a coma. Soumare immediately returned to Mauritania to visit his father and was able to visit him at the National Hospital. Soumare said that both of his father’s legs were broken, his face was bruised, and he was unable to see or hear the family. His father died on April 27,1996.
In 1997, Soumare joined the Action for Change (“AC”) party after meeting with a friend of his late father’s who was a senior member of the party. Soumare said that he joined the party because he “did not want [his] father to have died in vain and ... wanted to join the fight to change the government and equal rights for black Mauritanians.” J.A. at 189 (Supp. 1-589 Stmt, at 2). Soumare worked in the youth section of the party, distributing flyers, holding meetings and working to recruit young men. In 2002, the government of Mauritania banned the AC party.[3] In 2003 or 2004, Soumare joined the Popular Progressive Alliance (“PPA”), which like the AC party was headed by Messaoud Ould Boulkhair.
In his original asylum application (“I-589”) and an attached statement, in his supplemental 1-589 and an attached revised statement, and in his testimony before the IJ, Soumare described three incidents that occurred upon his return to Mauritania. The first of these incidents took place in November 2001, when Sou-mare went to local authorities in an effort to reclaim his family’s house. On November 5, 2001, Soumare was told by three Moor clerks at the State Office of Estates that he needed to bring his father’s death certificate and proof of relationship. When Soumare returned with the required documents the following day, he was told that the house now belonged to a white Mauritanian. One of the Moor clerks then called him a thief and began pushing him, and Soumare began pushing back. The police soon arrived, arrested Soumare, and took him to a police station. When he protested his innocence, according to Sou-mare, one of the officers said “Skout Kah-louch” (“Shut up Negro”). J.A. at 189 (Supp. 1-589 Stmt, at 2). The officers held Soumare for two days during which he was beaten, slapped in the face, stripped of his clothes and doused with' cold water, and called “black.” J.A. at 109 (Hr’g Tr. at 34:1-19); J.A. at 189 (Supp. 1-589 Stmt, at 2).[4] He was ultimately released after his brother-in-law, a Moor, spoke to police on his behalf.
The second of the incidents occurred on May 9, 2004. Two police officers came to Soumare’s workplace at A.F.R.I.T.E.L. and took him to the police station.[5] *78 “When the chief got there [he] grabbed me by the neck and told me that I was doing work for a banned party and that I was still claiming that [the white Mauritanian’s] house belonged to my family. I swore that the house belonged to my family. He then held me tightly by the back of my shirt, told me that he was closely watching my every move and threw me out the door.” J.A. at 189 (Supp. 1-589 Stmt, at 2). In his testimony before the IJ, Soumare added details that he did not mention in his 1-589 statement. According to Soumare’s testimony, the chief of police also forced him to sign something, another officer hit him in the stomach, and the chief threatened that he would “never see the sun anymore.” J.A. at 119-20 (Hr’g Tr. at 44:17-45:15). According to Sou-mare, after this incident he began fearing for his life. He subsequently applied for a visa at the U.S. Embassy, which was granted on July 6, 2004.
The third and final incident occurred on July 20, 2004, when Soumare returned from work to find his sister crying after police dropped off a summons ordering him to appear at the police station. Sou-mare testified that his sister believed the summons was related to his political activity and told him that if he didn’t leave politics he “would end up like [his] father ... arrested and killed.” J.A. at 116-17 (Hr’g Tr. at 41:19-42:4). After hiding at his uncle’s house, Soumare left Mauritania and traveled by land to Senegal before coming to the United States.
On August 2, 2004, Soumare was admitted to the United States on a nonimmi-grant visitor visa that expired on February 1, 2005. On February 3, 2005, Soumare submitted an application for asylum, withholding of removal, and protection under the Convention Against Torture to the Department of Homeland Security (“DHS”). On March 24, 2005, DHS began removal proceedings against Soumare as an alien who has remained in the United States for a time longer than permitted. The IJ held a merits hearing on March 15, 2006, at which Soumare and a longtime friend of the family, Saidou Wane, testified. The IJ then entered an oral decision denying Sou-mare’s applications for relief. First, the IJ found Soumare “not to be a fully credible witness.” J.A. at 25 (IJ Dec. at 11). While acknowledging that Soumare’s “testimony was for the most part, detailed, internally consistent and consistent with the asylum application and his statements,” the IJ noted several discrepancies between Soumare’s testimony and his written statements that in the “aggregate” gave him “concern about the overall credibility of the respondent, at least on key points.” Id. The IJ cited the following inconsistencies:
• Soumare testified that in 1989, when his family was forcibly removed to Senegal, his father and his two sisters were with him. However, his written statement indicated that a brother,' a sister, and his father were with him.
• Soumare testified that he saw his father only one time at the hospital after returning to Mauritania in 1996. However, in his written statement Soumare said that he was able to see his father every week from the time of the first hospital visit until his father’s death.
• Soumare testified that he visited the housing authority on November 6, 2001. However, according to the IJ, Soumare’s written statement indicated that this visit was on November 5, 2001.[6]
*79 • Soumare testified that after his arrest on November 6, 2001, he was forced to strip to his underwear and cold water was thrown on him. However, in his written statement he indicated that he was stripped naked.
• Soumare testified that water was thrown on him each night of the two days he was held in 2001. Soumare’s written statement, however, mentioned water being thrown on him only once, the morning after his arrest, rather than at night.
• Soumare testified that during his 2001 arrest he was hit in the stomach. His written statement did not indicate that he was hit in the stomach.
• Soumare testified that when he was arrested at his workplace on May 9, 2004, he was handcuffed, put in the car, and driven to the police station. However, Soumare’s written statement indicated that police asked him to follow them to the police station, where he was kept waiting until 2 p.m.
• Soumare testified that an officer punched him in the stomach causing him to fall to the floor during his detention in 2004. However, his written statement did not mention being punched in the stomach during the 2004 detention.
In his analysis of past persecution, the IJ looked only to the 2001 and 2004 incidents and not the 1989 deportation because Soumare “returned voluntarily to Mauritania [in 1996], living and working in Mauritania for approximately eight years, at ... a well paying job.” J.A. at 29 (IJ Dec. at 15). The IJ first concluded that the 2001 incident was “not supported by credible testimony.” Id. In the alternative, the IJ stated that the 2001 incident did not appear to rise to the level of persecution based on one of the protected grounds, because it occurred following Soumare’s arrest for a “physical altercation between himself and housing authority officials.” J.A. at 30 (IJ Dec. at 16). Next, the IJ found that the 2004 incident was also not supported by credible testimony. Specifically, the IJ cited discrepancies between Soumare’s testimony and his written statement on the details of how he was taken into custody. Finally, the IJ found that the corroborating evidence was not sufficient to establish Soumare’s claim of past persecution. Among other things, the IJ explained that Soumare should have supplied a statement from his sister who was a witness to many of these events. The IJ also found it “odd” that the summons that Soumare received on July 20, 2004, apparently required him to appear at 10 a.m. on that same day. J.A. at 33 (IJ Dec. at 19).
Next, the IJ found that Soumare did not establish that he had a well-founded fear of future persecution. The IJ noted that black Mauritanians, including Soninkes, have held positions in the Mauritanian government in recent years, that there was no evidence that members of the political party to which Soumare belonged were currently persecuted, and that a State Department report indicated that the government that took power after the 2005 coup had released numerous political prisoners.
Finally, the IJ denied withholding of removal and protection under the Convention Against Torture. Because Soumare had failed to show eligibility for asylum, the IJ concluded that Soumare had neees- *80 sarily failed to meet the higher burden for withholding of removal. The IJ also denied relief under the Convention Against Torture, finding no evidence in the record that Soumare would be tortured if returned to Mauritania and noting that Sou-mare’s past treatment did not appear to rise to the level of torture.
Soumare appealed to the BIA, which affirmed the IJ’s decision on October 22, 2007. The BIA found that the IJ’s “adverse credibility finding, which was based on inconsistencies involving matters such as the nature, circumstances, and severity of the harm which the respondent allegedly suffered, is supported by the record.” J.A. at 6 (BIA Dec. at 1). Citing the absence of credible testimony, the BIA concluded that Soumare did not adequately demonstrate past persecution or a well-founded fear of future persecution. In sum, the BIA stated that “[i]nasmuch as we are in agreement with the Immigration Judge’s decision, we affirm his decision based upon and for the reasons set forth therein.” J.A. at 7 (BIA Dec. at 2). Finally, the BIA rejected Soumare’s claim on appeal that his due-process rights had been violated because the IJ entered a “partial adverse credibility finding” that was not supported by the record, and because the record contained numerous “in-discernibles” that prevented adequate appellate review. The BIA explained that the “the elements noted by the Immigration Judge in support of the ‘partial’ adverse credibility finding are sufficient to constitute an adverse credibility finding for this proceeding.” Id.
Soumare timely filed this petition for review, arguing, among other things, that any discrepancies between his written statement and his testimony do not go to the heart of the matter. Soumare also argues, albeit perfunctorily, that his due-process rights were violated because the IJ denied asylum based on a “partially” adverse credibility determination. Sou-mare Br. at 22. Finally, citing the numerous “indiscernible” notations in the record, Soumare suggests that the record may be inadequate for appellate review.
II. ANALYSIS
A. Asylum Claim
The Attorney General may grant asylum to a “refugee,” defined as a person “who is unable or unwilling to return to” his country “because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.” 8 U.S.C. § 1101 (a)(42)(A). In order to establish refugee status, an applicant must show either past persecution or a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b). “The testimony of the applicant may be sufficient to sustain the applicant’s burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant’s testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee.” 8 U.S.C. § 1158(b)(l)(B)(ii). “ ‘[W]here it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant’s claim, such evidence should be provided.... The absence of such corroborating evidence can lead to a finding that an applicant has failed to meet her burden of proof.’ ” Dorosh v. Ashcroft, 398 F.3d 379, 382 (6th Cir.2004) (quoting In re S-M-J- 21 I. & N. Dec. 722, 724-26 (B.I.A.1997)).
We review adverse credibility findings under the following standard:
Credibility determinations are considered findings of fact, and are reviewed under the substantial evidence standard. Yu v. Ashcroft, 364 F.3d 700, 703 (6th *81 Cir.2004). This is a deferential standard: A reviewing court should not reverse “simply because it is convinced that it would have decided the case differently.” Klawitter v. INS, 970 F.2d 149, 151-52 (6th Cir.1992) (internal citations omitted). While an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons. See Daneshvar v. Ashcroft, 355 F.3d 615, 623 n. 7 (6th Cir.2004); Gao v. Ashcroft, 299 F.3d 266, 276 (3d Cir.2002) (“The reasons must be substantial and bear a legitimate nexus to the finding.”). An adverse credibility finding must be based on issues that go to the heart of the applicant’s claim. They “cannot be based on an irrelevant inconsistency.” Daneshvar, 355 F.3d at 619 n. 2 (6th Cir.2004). “If discrepancies ‘cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.’ ” Id. at 623 (quoting Shah v. INS, 220 F.3d 1062, 1068 (9th Cir. 2000)).
Sylla v. INS, 388 F.3d 924, 925-26 (6th Cir.2004).[7] “While it is true that irrelevant inconsistencies cannot constitute the basis for an adverse credibility determination, discrepancies may be relevant if they can be viewed as attempts by the applicant to enhance his claims of persecution.” Ndrecaj v. Mukasey, 522 F.3d 667, 674-75 (6th Cir.2008) (internal quotation marks and citations omitted). When, as here, the BIA adopts the reasoning of the Id’s opinion but makes additional comments, we review the IJ’s decision but also consider the additional comments of the BIA. Elias v. Gonzales, 490 F.3d 444, 449 (6th Cir. 2007). Although several of the discrepancies identified by the IJ do not go to the heart of the matter and cannot support an adverse credibility finding, we believe that the discrepancies related to Soumare’s arrests in 2001 and 2004 do go to the heart of the matter and support the conclusion of the IJ and BIA that Soumare is not credible.
First, Soumare testified before the IJ that he was punched in the stomach by police during his detention in 2001 and again during his detention in 2004. However, Soumare’s 1-589 statement failed to mention this fact, even though it provided specific details about other mistreatment allegedly suffered by Soumare during the 2001 and 2004 detentions. Because being hit in the stomach would have been the most serious physical abuse suffered by Soumare during his detentions in 2001 and 2004 and because Soumare’s claim of persecution depends largely on the abuse he suffered during those detentions, we cannot say that the IJ clearly erred in finding these omissions to be substantial discrepancies that go to the heart of Soumare’s asylum claim. Although these discrepancies are omissions rather than affirmative inconsistencies, these omissions are “substantially related to [Soumare’s] asylum claim” and therefore may support an adverse credibility determination. Liti v. Gonzales, 411 F.3d 631, 637 (6th Cir.2005). Second, Soumare provided inconsistent accounts of the circumstances of his arrest in 2004. Whereas Soumare testified that po *82 lice handcuffed him and drove him to the police station, his written statement asserted that police merely asked him to follow them to the station. Although there may be some conceivable explanation for this discrepancy, a reasonable adjudicator could find that this is a significant discrepancy that goes to the heart of the matter.
“While an adverse credibility finding alone will not defeat a claim for asylum, it will undermine a claimant’s efforts to meet his burden of proof — -particularly when the claimant reasonably could have presented, but did not present, corroborating evidence to support the claim.” Vuktilaj v. Mukasey, 277 Fed.Appx. 545, 549 (6th Cir. 2008) (unpublished). The IJ found that Soumare reasonably could have presented a statement from his sister, who was a witness to many of the events to which Soumare testified. On the record before us, we cannot find support for the IJ’s finding that a corroborating statement from Soumare’s sister was reasonably available. The record does not show, for instance, whether Soumare has received supporting documents from Mauritania in the mail or whether he has remained in contact with his sister or other family members since arriving in the United States. See Dorosh, 398 F.3d at 383 (upholding corroboration requirement where petitioner remained in contact with mother in country of origin but failed to obtain affidavit from her); Vuktilaj, 277 Fed. Appx. at 550 (upholding corroboration requirement where petitioner had received documents from country of origin, had cousin who had visited country twice since petitioner’s arrival in United States, and had obtained documents from that country after arriving in United States).
In light of the IJ’s adverse credibility determination, however, we conclude that substantial evidence supports the IJ’s finding that Soumare failed sufficiently to corroborate his claim. Soumare submitted the testimony of a family friend and several documents, including identification cards, a statement from the Secretary General of the Action for Change (“AC”) party concerning Soumare’s participation in that group, his father’s death certificate, and a medical certificate documenting treatment for the injuries he allegedly suffered during his detention in 2001. Although the IJ found that the record “contain[ed] some useful corroboration on some points,” the IJ concluded that this evidence was insufficient to establish Soumare’s claim. J.A. at 31 (IJ Dec. at 17). The statement from the General Secretary of the AC party, dated July 8, 1998, stated that Soumare was often the victim of arbitrary brutality and harassment from police and political officials because of his involvement in the AC party. However, the IJ questioned the veracity of this document because, according to Soumare’s own testimony, it was not until 2001 that he was subjected to mistreatment by the police because of his political activities. The IJ did not question the authenticity of Soumare’s father’s death certificate or of Soumare’s 2001 medical certificate, but found that each lacked sufficient detail to meaningfully advance Soumare’s claim. The death certificate did not state the cause of Soumare’s father’s death, and the medical certificate “did not contain any specific information on the type of treatment [Soumare] was given or the type of mistreatment which le[d] to the medical treatment.” J.A. at 32 (IJ Dec. at 18).
In sum, because the record does not compel us to reach a conclusion contrary to the IJ’s adverse credibility finding, we must conclude that Soumare has not met his burden to prove eligibility for asylum. Because we affirm the IJ’s findings regarding Soumare’s eligibility for asylum, Soumare necessarily cannot meet the “more stringent standard” for establishing *83 a claim of withholding of removal. Liti, 411 F.3d at 641 (internal quotation marks omitted). Finally, because no credible evidence in the record demonstrates that Soumare “ ‘more likely than not ... would be tortured if removed to’ ” Mauritania, he also cannot establish entitlement to relief under the Convention Against Torture. Id. (quoting 8 C.F.R. § 1208.16(c)(2)).
B. Due-Process Claim Regarding “Partial” Adverse Credibility Determination
In a section of his brief on appeal that otherwise addresses the IJ’s adverse credibility determination, Soumare makes a cursory reference to a due-process violation. See Soumare Br. at 22 (“The Immigration Judge ... violated] ... Petitioner’s Due Process rights when he made what he characterized [as] a partially adverse credibility determination. A denial of asylum relief based on a partially adverse credibility determination is a novel finding which is not supported by any asylum law.”). Because this issue was raised in a cursory manner without any citation or development of argument, we deem the issue waived. See United States v. San-dridge, 385 F.3d 1032, 1035 (6th Cir.2004) (“Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.” (internal quotation marks omitted)). In any event, although the IJ found Soumare partially credible, with regard to petitioner’s crucial encounters with Mauritanian authorities, the IJ found that Sou-mare’s testimony was fatally discrepant.
C. Adequacy of Record
Finally, Soumare alleges that the numerous “indiscernibles” in the transcript of his hearing before the IJ render the record inadequate for appellate review. Soumare does not clearly articulate a legal theory for his claim, but simply cites the statutory provision and regulations providing that a complete record must be kept of removal proceedings. Soumare Br. at 35; see 8 U.S.C. § 1229a(b)(4)(C) (“[A] complete record shall be kept of all testimony and evidence produced at the proceeding.”); 8 C.F.R. § 1003.5(a) (providing that, when there is an appeal, the IJ shall forward the record to the BIA upon request); 8 C.F.R. § 1240.9 (providing that the hearing before the IJ shall generally be recorded verbatim). Typically, however, such claims are raised as procedural-due-process violations. See, e.g., Garza-Moreno v. Gonzales, 489 F.3d 239, 241-42 (6th Cir.2007). Accordingly, we assume that Soumare is asserting a due-process challenge based upon the inadequacy of the record.
“We review de novo alleged due process violations in immigration proceedings.” Garzar-Moreno, 489 F.3d at 241. To succeed on a due process challenge to removal proceedings, the petitioner must show both “error and substantial prejudice.” Id. (internal quotation marks omitted). An error in the proceedings does not render the proceedings constitutionally defective unless the error “might have led to a denial of justice.” Id. (internal quotation marks omitted). We previously have expressed “ ‘concern that the government failed to meet its obligation [under 8 U.S.C. § 1229a(b)(4)(C) ] to prepare a reasonably accurate and complete record of the removal hearing.’ ” Garza-Moreno, 489 F.3d at 241 (quoting Sterkaj v. Gonzales, 439 F.3d 273, 279 (6th Cir.2006)). However, “a mere failure of transcription, by itself, does not rise to a due process violation.” Id. (internal quotation marks omitted). Instead, the petitioner must show “specific prejudice to his ability to perfect an appeal.” Id. at 242 (internal quotation marks omitted). Soumare cites the large number of “indiscernibles” in the hearing *84 transcript, but he does not identify particular facts missing from the transcript that would support his applications, nor does he point to a single argument that he was unable to make before the BIA or this court because of the incomplete transcript. In sum, because Soumare has not identified how the “indiscernibles” in the hearing transcript prejudiced his ability to perfect an appeal, we conclude that Soumare has not demonstrated a due-process violation.[8]
III. CONCLUSION
For these reasons, we DENY the petition for review.

. The State Department’s 2005 report on Mauritania describes continuing discrimination against ethnic minorities including black Mauritanians:
Racial and ethnic minorities faced societal discrimination. Racial and cultural tension and discrimination arose from the geographic and cultural divides between Moor and Black African. The Moors were divided among numerous ethno-linguistic tribal and clan groups and further distinguished racially as either White Moor or Black Moor, although it often was difficult to distinguish between the two by skin color. White Moor tribes and clans, many of whom were dark-skinned after centuries of intermarriage with Berbers and sub-Saharan African groups, dominated positions in government and business.... Concentrated in the south, the Halpulaar (the largest non-Moor group), the Wolof, and the Soninke ethnic groups were underrepresented in the military and security sectors.
Joint Appendix ("J.A.”) at 173 (U.S. Dep’t of State 2005 Country Report on Human Rights Practices: Mauritania at 12).

. In a revised statement attached to a supplemental 1-589 filed on November 11, 2005, Soumare stated that he, his younger sister, father, and brother were deported in 1989. However, in his testimony before the IJ, Sou-mare indicated that it was his two sisters and father who were deported along with him.

. Soon after joining the AC party in 1997, Soumare, who was trained as a telecommunications technician, was referred by the AC party’s president, Messaoud Ould Boulkhair, to a job at the telecommunications company A.F.R.I.T.E.L. Soumare worked as a crew chief at A.F.R.I.T.E.L. until leaving Mauritania in July 2004.

. In his testimony before the IJ, but not in his 1-589 statement, Soumare said that officers also hit him in the stomach. J.A. at 109 (Hr’g Tr. at 34:16-17).

.In his testimony before the IJ, Soumare stated that he was handcuffed and driven by the police to the station. J.A. at 119 (Hr’g Tr. at 44:2-4). However, in his 1-589 statement Soumare stated that the police officers “asked me to follow them to their station where they kept me waiting until 2 P.M.” J.A. at 189 (Supp. 1-589 Stmt, at 2).

. The IJ erred in finding an inconsistency on this point. Soumare's statements clearly indicated that he first visited the housing authority on November 5, 2001, but was then told *79 that he needed to bring his father's death certificate and proof of relationship. He then returned the following day, November 6, at which time the incident leading to his arrest occurred. Consistent with these statements, Soumare testified before the IJ that he was arrested on November 6, 2001.

. The REAL ID Act of 2005, Pub.L. 109-13, 119 Stat. 231, amended the standard for credibility determinations to provide that a trier of fact may make a credibility determination “without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant’s claim.” 8 U.S.C. § 1158(b)(l)(B)(iii); see Amir v. Gonzales, 467 F.3d 921, 925 n. 4 (6th Cir.2006). This change applies only to asylum applicants who file for relief on or after May 11, 2005. Because Soumare applied for asylum on February 3, 2005, the change does not apply, and the adverse credibility finding must be based on issues that go to the heart of his claim.

. In the same section of his brief, Soumare contends that the IJ failed to make credibility determinations as to all of the supporting evidence submitted by Soumare. Soumare does not advance a distinct legal theory for this argument, and it appears to be a repackaged challenge to the IJ's adverse credibility determination. As explained above, the IJ's adverse credibility finding is supported by substantial evidence. Moreover, Soumare fails to identify any specific evidence that the IJ allegedly disregarded. The IJ gave a detailed explanation of his adverse credibility finding regarding the discrepancies between Soumare's testimony and written statements. Similarly, the IJ provided a detailed evaluation of the corroborating documentary evidence submitted by Soumare, explaining the weighl given to various documents and his reasons for concluding that this evidence was insufficient to establish Soumare's asylum claim.