RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0334p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

IMAD ABDULAHAD,

                *Petitioner*,

      *v.*

ERIC H. HOLDER, JR., Attorney General,

                *Respondent*.

No. 08-3850

On Petition for Review of a Final Order
of the Board of Immigration Appeals.
No. A75 415 373.

Argued: June 16, 2009

Decided and Filed: September 15, 2009

Before: MOORE, GIBBONS, and FRIEDMAN, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** Russell R. Abrutyn, MARSHAL E. HYMAN & ASSOCIATES, PC, Troy, Michigan, for Petitioner. Jesse Lloyd Busen, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Russell R. Abrutyn, Marshal E. Hyman, MARSHAL E. HYMAN & ASSOCIATES, PC, Troy, Michigan, for Petitioner. Jesse Lloyd Busen, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

## OPINION

_____

FRIEDMAN, Circuit Judge. The principal issue in this immigration appeal is whether the record supports the immigration judge's determination that the marriage of a male non-citizen alien to a female American citizen was a sham, entered into to enable

_____

[*]The Honorable Daniel M. Friedman, Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

the alien to remain in the United States.  The alien also challenges various aspects of the proceedings before the immigration judge.  Based on her rulings, the immigration judge ordered the alien removed from the United States.  The Board of Immigration Appeals upheld that decision, and we **DENY** the petition for review.

I

A.  The petitioner Imad Abdulahad is a Syrian citizen who legally entered the United States as a nonimmigrant student in October 1994.  Before his student visa expired, in 1997 he married Carmel McKentry, a United States citizen.  Based on that marriage, the Immigration and Naturalization Service on March 24, 1998, adjusted his status to "conditional lawful permanent resident."  *See* Immigration and Naturalization Act § 216(a)(1) [8 U.S.C. 1186a(a)(1)].  Under that statute, within two years of that status adjustment and within 90 days of the end of that two-year period, the alien and his spouse were required to file a petition to remove the conditions on residence.  *See* INA §§ 216(c)(1), (d)(2)  [8 U.S.C. §§ 1186a(c)(1), (d)(2)]; 8 C.F.R. § 1216.2.

On January 31, 2000, Abdulahad and McKentry jointly filed such a petition. Approximately two years later, however, after an immigration official indicated to her during an interview that he knew she was not living with Abdulahad, McKentry withdrew her joinder in the petition.  She also filed two sworn statements that she had married Abdulahad in exchange for $6,000 to help him stay in the United States, that she and Abdulahad did not have a sexual relationship during their marriage, that she stayed at Abdulahad's house only occasionally, "in case INS showed up," and that her "marriage to Imad Abdulahad was a sham and entered into for the sole purpose of helping him stay in the United States."  She stated they had lived together for seven months.

In April 2002, the Immigration and Naturalization Service notified Abdulahad that because the joint petition was withdrawn, his conditional status was terminated, effective March 24, 2000, and that it proposed to remove him.  While the removal proceeding was pending, Abdulahad filed a new Petition to Remove the Conditions on

Residence, in which he requested a waiver of the joint filing requirement on the ground that his removal would cause extreme hardship and because he had married McKentry in good faith. He contends this filing extended his status as a conditional lawful permanent resident.  The Department of Homeland Security denied this petition on February 11, 2005.

In the removal proceedings, Abdulahad denied all charges and again requested a waiver of the joint petition requirements of § 216(c)(1), on the same grounds he previously had asserted:  extreme hardship and that he married McKentry in good faith.

At the hearing before the immigration judge in the removal proceedings, McKentry and Abdulahad presented conflicting evidence about their marriage. McKentry repeated the sworn statements she previously had made.  She testified that, in return for marrying Abdulahad she was to be paid $6,000 and was to participate in immigration proceedings. The marriage never was consumated and she and Abdulahad did not live together as husband and wife.  They never intended to establish a life together and she never behaved as if she was his wife, in public or with friends and family.  They had a joint checking account, which she occasionally used. Over the course of the marriage, Abdulahad gave her approximately four thousand dollars.

Before each of the two interviews with immigration officials she attended, McKentry and Abdulahad rehearsed what they were going to say, and they were not living together at the time of either interview. When she supposedly was living with Abdulahad in East Lansing, she instead was living in housing on the campus of Michigan State University. She signed various apartment leases to create the appearance that she and Abdulahad were living together.  Photographs of the two of them together that Abdulahad presented were taken to submit to immigration authorities as evidence that the two had established a life together.

McKentry testified that she had given inaccurate, sworn statements to the government at an interview with immigration officials, as well as in numerous documents submitted in support of Abdulahad's immigration efforts. She also testified

that on February 22, 2002, she signed a statement that her marriage was a sham and entered into solely to help Abdulahad stay in the United States.

While she was married to Abdulahad, she had a child by another man, of which Abdulahad was not aware until after it was born.

Abdulahad gave a completely different version of their relationship. He testified that the two were married in a civil wedding ceremony on August 5, 1997. No family members or friends attended or were even aware that a wedding would occur. After the wedding, he and McKentry began living together in East Lansing in a one-bedroom apartment. They also opened a joint checking account at Citizens bank. She co-signed his application for a student loan.

Abdulahad stated that his marriage with McKentry broke down after her younger sister died in 1998. He said that after that McKentry became a different person. She started partying and staying out late and eventually became a stripper at a local night club. He suspected her of drug use.

Abdulahad presented documentary evidence to support his claims, including apartment leases and joint bank account statements.

He admitted that his prior sworn statement to immigration officials that he and McKentry had not been separated for more than a day was false and gave multiple explanations for it. He was not truthful when he said they were living together in East Lansing at the time of the interview and explained the statement on the ground that he believed she "would always come back."

B.  In a lengthy oral opinion that discussed the evidence in detail, the immigration judge found that "this marriage was entered into solely for the purpose of the respondent obtaining his residency status, and this marriage was not entered into in good faith." She ordered him removed.

The immigration judge found Abdulahad "not to be credible and that his ex-spouse testimony was forthright and credible." The administrative judge "note[d]" "that

on direct examination," Abdulahad "was able to recall the dates, and the exact address where the respondent and his ex-spouse reportedly lived more then a decade ago" "with virtual perfect accuracy." The immigration judge then "f[ou]nd" that Abdulahad

> was essentially scripted during much of his testimony. It was apparent from this record that when the respondent was asked a question that was outside the confines of the dates of the marriage when he and his former spouse saw each other and the exact address of he and his former spouse resided, that he all of a sudden had memory problems and would often state that he couldn't recall certain things.

On the other hand, the immigration judge:

> found that the testimony of the respondent's ex-spouse to be forthright that she did not have an animosity towards the respondent and that she was very honest in her admissions to the court as to her untruthfulness to the Government during the interview process and why she was untruthful to the Government.

> The court further notes that the differences between the respondent and his ex-spouse's testimony in terms of the substance of nature of their relationship simply cannot be ignored.

The immigration judge discussed at length the various contradictions and inconsistencies between the testimony of Abdulahad and McKentry and within Abdulahad's own testimony and between that testimony and his prior sworn statements made to immigration officials.

C. The Board of Immigration Appeals ("Board") dismissed Abdulahad's appeal. It "adopt[ed] and affirm[ed] the decision of the Immigration Judge" "to the extent challenged on appeal." It also wrote an opinion explaining the reasons for its decision.

The Board rejected Abdulahad's argument that "the Immigration Judge erred in finding his former 'spouse' more credible than him." The Board also considered and rejected Abdulahad's other challenges to the immigration judge's decision, discussed in Part III below. At the end of its opinion, the Board stated: "In view of the above, we find no reason to disturb the Immigration Judge's decision." (Footnote omitted)

Where, as here, the Board adopts and affirms the immigration judge's opinion, but writes its own opinion explaining the reasons for its decision, we review both

opinions. *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008) (citing *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005)).

II

A.  We uphold an immigration judge's credibility determinations if they are "supported by reasonable, substantial and probative evidence on the record considered as a whole.*" Shan Sheng Zhao v. Mukasey*, 569 F.3d 238, 247 (6th Cir. 2009).  The immigration judge is required to give specific reasons for any adverse credibility determination.  *Koulibaly v. Mukasey*, 541 F.3d 613, 620 (6th Cir. 2008).  Where, as here, the trial tribunal's credibility determination rests significantly on its weighing of the witnesses' demeanor, "we will not overrule that determination lightly." *Gjolaj v. Keisler,* 252 Fed.Appx. 64, 68 (6th Cir. 2007).

In this case the immigration judge had a unique opportunity to judge the demeanor of Abdulahad and McKentry while they testified - - an opportunity we do not have on the cold transcript of the record.  Her determination that McKentry was credible and Abdulahad not credible rested in substantial part on her evaluation of their respective demeanor, and is supported by substantial evidence.

The immigration judge fully, adequately, and convincingly explained the reasons for her conclusion.  As she stated, Abdulahad's testimony appeared "scripted" because he was able to recall the dates and addresses where he and McKentry allegedly lived together "with virtual perfect accuracy," but when questioned on other facts "he all of a sudden had memory problems and would often state that he couldn't recall certain things."  The immigration judge also pointed out inconsistencies in Abdulahad's testimony and his admission that he had made false sworn statements during interviews with immigration officials.  In contrast, the immigration judge found that McKentry's testimony was "forthright," that she had no "animosity toward" Abdulahad and was "honest in her admissions . . . as to her untruthfulness to the Government during the interview process."

In sum, like the Board, "we find no reason to disturb" the immigration judge's finding that Abdulahad's marriage was a sham, entered into in an attempt to allow him to remain in the United States.

B.  Our affirmance of the ruling that the marriage was a sham also requires rejection of Abdulahad's contention that §237(a)(1)(A) of the Immigration and Naturalization Act, 8 U.S.C. §1227(a)(1)(A), pursuant to which the immigration judge ordered Abdulahad removed, did not authorize that action.  That section provides: "Any alien who at the time of entry or adjustment of status was within one or more of the classes of aliens inadmissible by the law existing at such time is deportable."  One of the classes of inadmissible aliens is described in section 212(a)(6)(C)(i) of that Act, 8 U.S.C. §1182(a)(6)(C)(i) ,which states:

> Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this Act is inadmissible.

The immigration judge found that Abdulahad also was removable under § 237(a)(1)(G) of that Act, 8 U.S.C. § 1227(a)(1)(G), captioned "Marriage fraud," which makes deportable an alien for "having procured a visa or other documentation by fraud," if "it appears to the satisfaction of the Attorney General that the alien has failed or refused to fulfill the alien's marital agreement which in the opinion of the Attorney General was made for the purpose of procuring the alien's admission as an immigrant."

We review the immigration judge's ruling on those issues "to determine whether substantial evidence supports the factual findings underlying the IJ's decision regarding the nature of the marriage." *Fang Huang v. Mukasey*, 523 F.3d 640, 649 (6th Cir. 2008). Under this standard, "a factual determination by the Board that an alien's marriage was entered into for the purpose of gaining entry into the United States is conclusive if it is supported by reasonable, substantial, and probative evidence in the record considered as a whole." *Id.*  There is no reason why this standard should not also apply in reviewing the immigration judge's ruling that the fraudulent marriage was entered into for the

purpose of remaining in this country after the alien's initial period of lawful residence had ended.

Based on the evidence previously discussed, we uphold the immigration judge's ruling that Abdulahad is removable under § 237(a)(1), as supported by substantial evidence.

III

Abdulahad's other challenges of the decision of the immigration tribunals need not detain us long.

A.  Abdulahad contends that the immigration judge was biased against him because she previously worked at the Immigration and Naturalization Service regional office as a trial attorney and Chief Counsel.  He does not contend, or point to any evidence that she participated in the investigation or prosecution of the charges against him.  Her prior government service without more does not establish bias.  As the Seventh Circuit stated in *Petrov v. Gonzales*, 464 F.3d 800, 803 (2006), in rejecting the contention that an immigration judge's prior service as chief counsel in the immigration service office that handled a removal case established bias against the removed alien, the alien's "position has neither factual nor legal support."  464 F.3d at 803.  As that court pointed out, "[n]othing in the record implies" that the administrative judge "had any involvement" in the decision "to commence removal proceedings." *Id.*

Similarly without substance is Abdulahad's contention that the administrative judge's bias was shown by her questioning of witnesses.  The immigration laws explicitly authorize an immigration judge to "interrogate, examine, and cross-examine the alien and any witnesses."  8 U.S.C. § 1229a(b)(1).  Rather than showing bias, the immigration judge's questioning of witnesses appeared designed to aid in fully developing the factual record in the case.  There is no showing that her questioning of witnesses favored the government over Abdulahad.

B.  Abdulahad next contends that he was denied due process because the hearing transcript contains a number of "indiscernible" entries instead of the text of McKentry's actual testimony.

For his due process claim to succeed, Abdulahad must show that the alleged defect in the record transcript prejudiced him.  *Gishta v. Gonzales*, 404 F.3d 972, 979 (6th Cir. 2009).  We agree with the Board that "the record of proceedings [is] sufficient for our review on appeal.  In addition, the respondent has not identified what material facts, if any, were omitted from the record and has, therefore, failed to show that such indiscernible testimony caused him prejudice."

C.  Finally, Abduluhad challenges the Board's denial of an "extreme hardship" waiver of the joint filing requirement for the condition-removing petition.  Under § 216(c)(4)(A) of the Immigration and Naturalization Act, 8 U.S.C. § 1186a(c)(4)(A), the Attorney General in his discretion may remove the conditions on permanent resident status for an alien who is unable to comply with the joint-filing requirements, if the alien demonstrates that "extreme hardship would result if such alien is removed."  Abdulahad contends that the Board used an erroneous time frame in making its extreme hardship analysis.

According to Abdulahad, the proper date for terminating his conditional status was April 25, 2007 (the date of the immigration judge's decision), not March 24, 2000, as the immigration judge determined.  The latter determination correctly reflected section 216(c)(2)(A) of the Immigration & Naturalization Act, 8 U.S.C. § 1186 a( c )(2)(A), which requires the Attorney General to "terminate the permanent resident status of the alien as of the second anniversary of the alien's lawful admission for permanent residence."  March 24, 2000 was the second anniversary of Abdulahad's obtaining his conditional resident status on March 24, 1998.

This court has jurisdiction to determine whether the proper time frame was used. *See Billeke-Tolosa v. Ashcroft,* 385 F.3d 708, 711 (6th Cir. 2004) (non-discretionary decisions are reviewable, even where they "underlie determinations that are ultimately discretionary.").  The Board addressed Abduluhad's argument that the wrong time period

was used, and stated that "even if we accept [his argument] that his conditional permanent resident status was not terminated on March 24, 2000 we would still find that the hardships described by the respondent on appeal… do not rise to the level of extreme hardship." This latter determination is within the discretion of the Attorney General and we cannot review its merits. *See Valenzuela-Alcantar v. INS*, 309 F.3d 946, 949-50 (6th Cir. 2002).

## CONCLUSION

The petition for review is **DENIED**.