NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0496n.06

Case No. 13-3622

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 09, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| LAXMAN THAPA; ANITA THAPA, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE UNITED STATES |
| | ) | BOARD OF IMMIGRATION |
| ERIC H. HOLDER, JR., | ) | APPEALS |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | **O P I N I O N** |

BEFORE: BOGGS, COLE, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Laxman and Anita Thapa appeal the denial of their request for asylum and withholding of removal. They contend that there were errors in the interpretation and transcription of their testimony before the Immigration Judge, that their asylum and withholding-of-removal claims were wrongfully denied, and that they were entitled to withholding under the Convention Against Torture. For the following reasons, we deny the petition for review.

## I. BACKGROUND

Laxman and Anita Thapa arrived in the United States on November 13, 2007. Both are natives and citizens of Nepal. At the time they sought admission, the Thapas lacked valid entry documents, and were detained. The Department of Homeland Security issued a Notice to

Appear in December 2007, and indicated that the Thapas were subject to removal pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I). The Thapas conceded the charge of removability, but filed an application for asylum and for withholding of removal on the basis that Mr. Thapa had been persecuted on account of his political beliefs and status as a successful businessman. The Thapas also sought protection under the Convention Against Torture.

At the merits hearing assessing their qualifications for asylum, Mr. and Mrs. Thapa testified and presented evidence. The Immigration Judge found them to be credible. In his testimony, Mr. Thapa indicated that he had been a member of the pro-royalist National Democratic Party and had acted as a local party activist, attending monthly meetings, distributing fliers, and advocating with villagers for the party. Mrs. Thapa did not participate in politics.

Mr. Thapa also testified that he owned a company called Hard Rock Treks and Expeditions Private Limited, which provided Himalayan expeditions for tourists. Beginning in 2001, while he was trekking with tourists, Mr. Thapa was detained and robbed at gunpoint by Maoists from the Maoist Communist Party. One of the assailants had a handgun and the other had a sword or "sword type of weapon." When asked by the Immigration Judge if he was detained because he was a member of the National Democratic Party, Mr. Thapa responded, "That time I don't—I didn't know that they knew me as a member of the national democratic party." Mr. Thapa reported the incident to the police, who said they would investigate. Nothing ever came of the investigation. Such robberies of trekkers were a commonplace occurrence.

Following this initial robbery in 2001, Mr. Thapa testified that he was robbed approximately 40 to 50 times over a five-year period. He reported these incidents to the police but nothing ever resulted from the investigations. While Mr. Thapa believes that some of the robbers knew that he was a member of the National Democratic Party, he also concedes that he

"[n]ever met [the] same Maoists." There is a common pattern to most of the robberies described by Mr. Thapa. The thieves, carrying a "sword type of weapon" or some other weapon, would stop Mr. Thapa and his tourist trekkers in the mountains and demand money and support for the Maoist cause. While Mr. Thapa claims that Maoists killed individuals that did not support them, he acknowledges that he was never physically harmed.

Mr. Thapa also alleged that he was harassed at his office and home. For example, in 2003, Maoists came to his office, threatened to kill him if he continued to support the royalist cause, and robbed him after telling him that "the revolution can never succeed without killing people." The Maoists netted approximately $200 in the robbery, which was roughly equivalent to one day's gross revenue. Three years later, in August 2006, Maoists came to his house, while Mr. Thapa was at work, and chanted "glory to Maoists." According to Mr. Thapa's family, who were home at the time of the event, the Maoists then called out the names of Mr. Thapa and his brother, who is a member of the Nepalese army. The Maoists threatened to burn the house down, but never took action, following the intervention of Mr. Thapa's neighbors.

Following this incident, Mr. Thapa traveled to the United States on a B-1/B-2 business tourist visa in December of 2006. This was not Mr. Thapa's first trip overseas. Prior to his visit to the United States, Mr. Thapa also visited Holland in 2002 and England in 2004. Mr. Thapa returned to Nepal from the United States in March of 2007.

After his return, in April of 2007, members of the Youth Communist League, a youth wing of the Maoists, threatened to kill Mr. Thapa if he did not stop supporting the king. At the time of the threat, none of the members of the Youth Communist League were armed. Mr. Thapa never reported the incident to the police because the Maoists, by this point, were part of the government. The next month, in May of 2007, another group of Maoists came to his office

armed, threatened him and threatened to bomb his office, and robbed him. Finally, in August 2007, Maoists came to Mr. Thapa's residence, again while he was away, and made threats. Following this final incident, Mr. Thapa returned to the United States with his wife in November 2007 out of fear for their safety.

Following presentation of this evidence, the Immigration Judge issued an oral decision and order on July 21, 2011 denying the Thapas' request for asylum, withholding of removal, and withholding under the Convention Against Torture. The Thapas appealed the decision to the Board of Immigration Appeals, and the Board affirmed the Immigration Judge's ruling on April 23, 2013. This appeal from the Thapas followed.

## II.    ANALYSIS

The Thapas raise on appeal four arguments: (1) They contend that the translator's poor interpretation of their testimony before the Immigration Judge and the occasionally indiscernible transcription of their testimony violated the Fifth Amendment's Due Process Clause. (2) They argue that their asylum claim was wrongfully denied. (3) They contend that withholding of removal was wrongfully denied. (4) They argue that they were entitled to withholding under the Convention Against Torture. We address each argument in turn.

### A. Due-Process Claim

The Thapas first contend that they were prejudiced by the translator's poor interpretation and poor transcription of their testimony, and that this prejudice violated the Fifth Amendment's due-process guarantee. While there do appear to have been some interpretation and transcription issues, the problems were minimal and did not cause actual prejudice affecting the outcome of their case.

Due process demands that aliens be provided with a "full and fair hearing," *Al-Ghorbani v. Holder*, 585 F.3d 980, 982 (6th Cir. 2009), and that the government "prepare a reasonably accurate and complete record of the removal hearing," *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006). "To prevail on a due process claim, a petitioner must demonstrate actual prejudice, and that the alleged prejudice materially affected the outcome of his or her case." *Mapouya v. Gonzales*, 487 F.3d 396, 416 (6th Cir. 2007). We review a due-process claim de novo. *Ahmed v. Gonzales*, 398 F.3d 722, 725 (6th Cir. 2005).

The first and only purported "mistranslation" cited by the Thapas related to the phrase "sword type of weapons." When asked by the Thapas' attorney if during one of the robberies the Maoists possessed weapons, the translator stated that they possessed "sword type of weapons." *Id.* When the judge then sought clarification, the translator indicated that they had "swords." *Id.* The Thapas claim that "[i]t is not completely clearly [sic] whether Thapa was threatened with a sword, or a weapon resembling a sword." This is a distinction without a meaningful difference. Whether Mr. Thapa was threatened with a sword or something analogous, the court clearly understood that he had been threatened with a "sword type of weapon" and that he feared physical harm from the Maoists because they possessed such weapons. The Thapas are unable to point out any other "mistranslations" and concede that while "[t]he interpreter had to ask for clarification a lot . . . the facts of each incident were still understandable." Accordingly, the Thapas have not shown that the singular mistranslation resulted in actual prejudice.

Turning then to the parts of the record that were unclear, several responses in the record are marked as "indiscernible." Such a deficiency does not necessarily constitute a due-process violation so long as there is still a sufficient record for review and the indiscernible testimony does not cause prejudice. *See Abdulahad v. Holder*, 581 F.3d 290, 296 (6th Cir. 2009); *Garza-*

*Moreno v. Gonzales*, 489 F.3d 239, 241–42 (6th Cir. 2007). "[A] mere failure of transcription, by itself, does not rise to a due process violation." *Garza*, 489 F.3d at 242 (internal citation omitted).

With only a few minor exceptions, and as the Thapas acknowledge, almost all of the untranslated answers are from Mrs. Thapa's testimony. Her testimony, which followed Mr. Thapa's testimony, was used primarily for corroboration purposes regarding Mr. Thapa's business, his political activities, and the threats they received. As the Immigration Judge found Mr. Thapa's testimony to be credible, many of the indiscernible responses are simply immaterial because they reiterated basic facts that were already known and believed by the court.

Other indiscernible responses were later clarified by Mrs. Thapa's subsequent testimony. For example, when asked if her husband had problems with any persons, Mrs. Thapa responded, "Yes. Used to tell me the Maoists (indiscernible)." The court then sought to clarify her answer and asked "when did he – when did you first learn about him being threatened by the Maoists?" *Id.* And she responded with a more lengthy explanation of the threats. *Id.* at 328–29. These types of clarifying answers act to cure the deficiency in an indiscernible transcription.

The Thapas nonetheless contend that while "some of the interpretation and transcription problems taken individually may not have been prejudicial, the cumulative effect does rise to the level of prejudice." Problematically, however, they fail to identity what omitted "material facts" prejudiced them. *See Abdulahad*, 581 F.3d at 296; *Soumare v. Holder*, 343 F. App'x 75, 83–84 (6th Cir. 2009). In *Garza-Moreno v. Gonzales*, we determined that a transcript that had 67 indiscernible notations did not violate the Due Process Clause because "Petitioners [did] not point us to a single argument that the 'indiscernible' notations precluded them from advancing before the BIA or this court." *Garza*, 489 F.3d at 242; *see also Abdulahad*, 581 F.3d at 296;

*Soumare*, 343 F. App'x at 83–84. Similarly here, it is insufficient to merely claim that had the "[Immigration Judge] heard with her own ears Mrs. Thapa's testimony clearly and interpreted clearly, she would have granted asylum." Because the Thapas have not identified how the indiscernible portions of the transcript prejudiced them, we conclude that they have not demonstrated actual prejudice that affected the outcome of the proceeding and have not supported their due-process claim.

## B. Asylum Claim

The Thapas next contest the denial of their petition for asylum. We review questions of law involving immigration proceedings de novo and assess factual findings and determinations of a petitioner's eligibility for asylum under the substantial-evidence standard. *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007). Accordingly, determinations must be "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). "Reversal of a factual determination of the BIA is only warranted when the reviewing court finds that the evidence not only supports a contrary conclusion, but *compels* it." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004). Because the Immigration Judge found the Thapas to be credible, "we must accept the representations petitioners made in the application and their testimony as true." *Gilaj v. Gonzales*, 408 F.3d 275, 285–86 (6th Cir. 2005).

The first step in assessing an application for asylum is to determine whether the applicant is a "refugee" as defined in the Immigration and Nationality Act ("Act"), 8 U.S.C. § 1101(a)(42)(A). *See* 8 C.F.R. § 1208.13(a) ("The burden of proof is on the applicant for asylum to establish that he or she is a refugee. . . ."); *Abdurakhmanov v. Holder*, 735 F.3d 341, 345 (6th Cir. 2012). The Act defines a "refugee" as the following:

> [A]ny person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). As the definition indicates, a refugee applicant either has to establish past persecution, in which case the applicant is presumed to have a well-founded fear of future persecution, or the applicant must demonstrate a well-founded fear of future persecution. *See Abdurakhmanov*, 735 F.3d at 345. Once it has been determined that an individual qualifies as a refugee, the second step is whether "the applicant merits a favorable exercise of discretion by the Attorney General." *Id.* (internal citation and quotation marks omitted).

Following this two-step process, we first assess whether the Thapas have suffered past persecution or have a well-founded fear of future persecution. The Thapas claim that the Maoists persecuted them on account of Mr. Thapa's political opinion and membership in the National Democratic Party and also because he belongs to a targeted "social group" as a "successful businessman." Because Mr. Thapa did not raise the claim of persecution on account of his status as a "successful businessman" before the Board of Immigration Appeals, we only address the alleged persecution on account of political opinion. *See* 8 U.S.C. § 1252(d)(1); *Bi Xia Qu v. Holder*, 618 F.3d 602, 609 (6th Cir. 2010); *Hasan v. Ashcroft*, 397 F.3d 417, 419–20 (6th Cir. 2005).

The Act does not define persecution, but Sixth Circuit precedent does provide guidance. *See Japarkulova v. Holder*, 615 F.3d 696, 699–700 (6th Cir. 2010). We have previously noted that "persecution is an extreme concept that does not include every sort of treatment our society regards as offensive," *Ali v. Ashcroft,* 366 F.3d 407, 410 (6th Cir. 2004) (internal citation and quotation marks omitted), and accordingly, "a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant

deprivation of liberty" does not constitute persecution, *Mikhailevitch v. INS*, 146 F.3d 384, 389–90 (6th Cir. 1998).

In the present case, the Board of Immigration Appeals determined that the "mistreatment that the respondents were subjected to in Nepal . . . is not sufficiently severe to rise to the level of persecution" and also that there is "insufficient evidence in the record to show that [Mr Thapa's] political activities were or will be at least one central reason for the claimed persecution." While this is a closer call than the due-process claim, we conclude that there is substantial evidence to support the Board's determinations.

Mr. Thapa testified that Maoists threatened and robbed him twice at his office and forty to fifty times while he was guiding tourists, and that Maoists came to his house twice and threatened him. The sheer volume of incidents might suggest that Mr. Thapa was intentionally targeted, but a closer look reveals that the lion's share of incidents occurred while Mr. Thapa was trekking through the mountains in Maoist territory where such robberies were commonplace. As Mr. Thapa conceded, it was "almost daily news that the Maoists used to by force take money away from the trekkers in the mountains." *See also* Travel Warning, U.S. Dep't of State, Nov. 19, 2009 ("Theft and muggings occasionally occur in popular tourist and trekking areas . . . . Trekkers have been robbed by small groups of young men, even on popular trails."). All of this suggests that the trek-related robberies were the byproduct of Mr. Thapa's working in a given geographic region, rather than express targeting. Additionally, as the Board of Immigration Appeals indicated, the fact that Mr. Thapa was never robbed twice by the same group or individual further suggests that he was a victim only of general unlawfulness, which is not a basis for a finding of persecution. *See, e.g.*, *Castellano–Chacon v. INS*, 341 F.3d 533, 550–51 (6th Cir. 2003), *abrogated on other grounds by Almuhtaseb v. Gonzales*, 453 F.3d 743 (6th Cir.

2006); *Almuhtaseb*, 453 F.3d at 750; *accord Singh v. INS*, 134 F.3d 962, 967 (9th Cir. 1998) (holding that an alien "must show that [she] is at particular risk—that [her] predicament is appreciably different from the dangers faced by [her] fellow citizens").

Focusing specifically on the office robberies and the incidents at Mr. Thapa's house, neither Mr. Thapa nor any member of his family was physically harmed in these altercations. Mr. Thapa's family, including his brother who also was targeted by the Maoists, still live in Nepal, and no evidence has been presented that they have been harmed. While troublesome, the Maoist conduct can best be described as harassment, and does not fall into the egregious category of offenses, such as "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture" that "cross the line from harassment to persecution." *Gilaj*, 408 F.3d at 285. We also note that Mr. Thapa traveled overseas to Europe in 2002 and 2004 and then to the United States in 2006 after having been robbed and threatened numerous times, but never sought asylum during any of these trips.

This is not to say that threats, by themselves, can never amount to persecution. But such cases involve exceptional circumstances. *See, e.g.*, *Boykov v. INS*, 109 F.3d 413, 416 (6th Cir. 1997) ("In the vast majority of cases, however, mere threats will not, in and of themselves, compel a finding of past persecution."); *Lim v. INS*, 224 F.3d 929, 936 (9th Cir. 2000) ("Threats standing alone . . . constitute past persecution in only a small category of cases."). This is primarily because "[o]nly threats of a most immediate and menacing nature can possibly qualify as past persecution." *Japarkulova v. Holder*, 615 F.3d 696, 701 (6th Cir. 2010) (internal citation and quotation marks omitted).

For example, in *Japarkulova v. Holder*, we concluded that a threat by a security minister to arrange for a "fatal accident" if the asylum petitioner continued to expose corruption, while

ominous, was not sufficiently "immediate and menacing" because the petitioner did not suffer any physical mistreatment and continued to be involved in opposition activities for several years following the threat. *Id.* Similarly, despite being repeatedly threatened over a several-year period, Mr. Thapa nonetheless continued to be involved in royalist activities and was never physically harmed. The threats that he suffered are of a generic variety and are not sufficiently imminent to constitute past persecution. *See Boykov*, 109 F.3d at 416; *see also Li v. Att'y Gen. of the United States*, 400 F.3d 157, 165 (3d Cir. 2005) (to qualify as persecution, threats must be "sufficiently imminent or concrete"); *Lim*, 224 F.3d at 936 (threats will qualify as persecution only when they "are so menacing as to cause significant actual suffering or harm") (internal citation and quotation marks omitted). Thus, substantial evidence supports the Board of Immigration Appeals's determination that the Maoist[1] harassment does not rise to the level of past persecution.

We similarly conclude that substantial evidence supports the conclusion that the Thapas have not suffered economic persecution. While Mr. Thapa was repeatedly robbed by the Maoists when leading trekking trips, he still managed to attract tourist trekkers and his company remained economically viable. By all accounts, Mr. Thapa was a "successful businessman," as his claim to being persecuted on those grounds implicitly acknowledges. As to the two robberies that Mr. Thapa experienced at his office, while these were undoubtedly frightening, they were also relatively negligible in terms of monetary loss. Mr. Thapa was robbed each time of approximately one day's revenue. Taken together, there is substantial evidence that the economic deprivation suffered by the Thapas is not "sufficiently severe" to constitute economic

---

[1] The Thapas request that we take judicial notice of the fact that the Communist Party of Nepal (Maoist) is a "Specifically Designated Global Terrorist" organization. Even were we to take such notice, the Thapas still have not provided sufficient evidence to compel the conclusion that they suffered from past persecution or will suffer future persecution.

persecution. *Daneshvar v. Ashcroft*, 355 F.3d 615, 626 n.9 (6th Cir. 2004) ("Economic deprivation constitutes persecution only when the resulting conditions are sufficiently severe."); *see also Stserba v. Holder*, 646 F.3d 964, 976–77 (6th Cir. 2011) ("[A] sweeping limitation of opportunities to continue to work in an established profession or business may amount to persecution even though the applicant could otherwise survive." (internal citation and quotation marks omitted)).

Finally, we address whether the Thapas have a well-founded fear of future persecution. The same evidence that was provided to demonstrate that the Thapas suffered past persecution also underpins their claim of future persecution. Just as we found this evidence insufficient to support their claim of past persecution, we likewise find it insufficient to sustain their claim of future persecution for the same reasons discussed above. Thus, substantial evidence supports the Board of Immigration Appeals's determination that the Thapas are ineligible for asylum.

## C. Withholding of Removal

The burden of proof to withhold removal under the Act is greater than the burden to establish eligibility for asylum. *See generally INS v. Stevic*, 467 U.S. 407, 413 (1984) (indicating that to avoid deportation an "alien must establish a clear probability of persecution"). To prevent removal, an alien must demonstrate that "it is more likely than not that the [alien] would be subject to persecution." *Id.*; *see also* 8 C.F.R. § 1208.16. Consequently, as the Thapas have failed to establish their eligibility for asylum, they have also not established their eligibility for withholding of removal. *See Lumaj v. Gonzales*, 462 F.3d 574, 578 (6th Cir. 2006); *Mikhailevitch*, 146 F.3d at 391.

**D. Convention Against Torture**

Lastly, the Thapas argue that withholding of removal should have been granted under the Convention Against Torture. Under the Convention, the applicant for withholding bears the burden of proof to "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Ali v. Reno*, 237 F.3d 591, 596 (6th Cir. 2001) (quoting 8 C.F.R. § 208.16(c)(2) (2000)). In support of their claim, the Thapas summarily assert without support that "Mr. Thapa has demonstrated that he was subject to torture and lived in fear in Nepal." As the Thapas have failed to explain how Mr. Thapa was tortured or to provide any case support that the alleged conduct did, in fact, constitute torture, they have failed to carry their burden of proof for relief under the Convention Against Torture.

## III.   CONCLUSION

For all of these reasons, we DENY the petition for review by the Thapas.