NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0711n.06

No. 08-4260

**FILED**
**Nov 02, 2009**
LEONARD GREEN, Clerk

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

NATALJA STEINBERGA,

    Petitioner,

      v.

ERIC H. HOLDER, JR., Attorney General,

    Respondent.

On Petition for Review from
the Board of Immigration
Appeals

_____/

**Before:**      **MARTIN, GUY, and McKEAGUE, Circuit Judges.**

**PER CURIAM.**      Petitioner Natalja Steinberga seeks review of a decision by the

Board of Immigration Appeals (BIA) affirming the Immigration Judge's (IJ's) decision to

deny her applications for asylum, withholding of removal, and relief under the Convention

Against Torture (CAT). Petitioner challenges the adverse credibility determination, the

reliance on a lack of corroboration, and the determination that petitioner failed to make the

necessary showing for asylum, withholding of removal, or relief under the CAT. Petitioner

also argues that her due process rights were violated by the exclusion of late-filed exhibits

that she argues could support a claim for humanitarian asylum. Finding that substantial

evidence supports the BIA's decisions, and rejecting the due process claim, we deny the

petition for review.

**I.**

Natalja Steinberga, a native and citizen of Latvia, arrived in the United States as a nonimmigrant visitor in February 2004, but became pregnant and overstayed her visa without authorization when it expired in August 2004. Petitioner filed an application for asylum in January 2005, and gave birth to her son Saava, a United States citizen, in February 2005. Her application for asylum was not granted, and removal proceedings were commenced with the filing of a Notice to Appear in April 2005.

Petitioner conceded removability at a preliminary hearing in November 2005, and submitted a supplemental asylum application at a hearing in May 2006. Petitioner was the only witness at the merits hearing conducted on June 19, 2007, after which the IJ rendered an oral decision denying petitioner's applications for relief. The IJ also denied the motion to accept a number of late-filed exhibits. Petitioner filed a timely notice of appeal with the BIA, which was dismissed on September 2, 2008.

The BIA found no clear error in the IJ's adverse credibility determination, emphasized the lack of corroborating evidence concerning the events and petitioner's Jewish ethnicity, and found no error in the exclusion of the late-filed evidence because none of it was new or previously unavailable. Absent credible testimony, the BIA concluded that petitioner failed to meet her burden of proof for asylum or withholding of removal. In addition, the BIA found that the record did not indicate a clear probability of torture at the instigation of, or with the consent or acquiescence of Latvian governmental officials. Petitioner seeks review

of the BIA's final order dismissing her appeal.[1]

## II.

We review the BIA's legal determinations *de novo* and its factual findings for substantial evidence. *Mostafa v. Ashcroft*, 395 F.3d 622, 624 (6th Cir. 2005). We will uphold the findings "as long as they are supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id*. (quotation marks and citations omitted). When, as here, the BIA adopts the IJ's decision and makes additional comments and findings, we directly review the decision of the IJ while considering the BIA's additional determinations. *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005). We will not reverse the BIA's decision "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

To qualify for asylum, an applicant must establish "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" if he were to return to his country of origin. 8 U.S.C. § 1101(a)(42)(A). To qualify for withholding of removal, an applicant's burden is higher—she must demonstrate a "clear probability of persecution." *Gumbol v. INS*, 815 F.2d 406, 411 (6th Cir. 1987) (quotation marks omitted). To qualify for CAT relief, an applicant must show "that it is more likely

---

[1]Petitioner filed a number of exhibits with the BIA that were already part of the administrative record, including several articles from the Union of Councils for Jews in the Former Soviet Union and the State Department Country Reports for 2003. (Exhibits B to R.) Also included were the exhibits rejected by the IJ, which were (1) a 2007 letter from a Rabbi in the United States attesting that petitioner is Jewish; and (2) records of Oakland County's assessment of petitioner's son Saava at 18 months reflecting "areas of concern" in development of language, self-help, coping behaviors, and "relationships to persons, emotions, and feeling states." Finally, petitioner included two new exhibits that were not proffered to the IJ; those were corroborating statements prepared by petitioner's parents after the merits hearing was held. (Exhibits Y and Z.)

than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2).

An applicant's credible testimony "may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.13(a). Under the standards applicable to this claim, the IJ's "adverse credibility determination 'must be based on issues that go to the heart of the applicant's claim.'" *Shkabari v. Gonzales*, 427 F.3d 324, 329 (6th Cir. 2005) (quoting *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004).[2] The IJ found that petitioner's testimony was not credible, relying both on inconsistencies and a lack of corroboration. The IJ also concluded that even if petitioner were found to be credible, her testimony was not sufficient to demonstrate eligibility for any of the relief she sought.

Born in Riga, Latvia, in 1978, petitioner claimed that she suffered past persecution because she is Jewish and Russian. She related how her parents had to pay bribes to get her into the Russian school, how other children were not allowed to talk or play with her, and how they would call her names like "kike" and "dirty Jew." One Latvian boy named Artis, who lived near her, despised her for being a Jew and would humiliate her in public.

In 1993, when petitioner was 15 years old, Artis beat up another boy for having walked her home. Petitioner told her mother, who approached Artis's mother in a shopping center and told her to watch her son and his friends. The other mother rebuffed her, saying

---

[2]The REAL ID Act of 2005, Pub.L. 109-13, 119 Stat. 231, amended the INA, 8 U.S.C. § 1158(b)(1)(B)(iii), to provide that a trier of fact may make a credibility determination "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." This amendment is inapplicable here because it does not apply to applications for relief and protection from removal filed before May 11, 2005. REAL ID Act § 101(h)(2). *See El-Moussa v. Holder*, 569 F.3d 250 (6th Cir. 2009) (applying new standard of review).

she did not want to be seen talking to a Jew. A few days later, petitioner was out walking when she saw Artis driving a car with two of his friends. They abducted her and took her to a wooded area, where Artis raped her while the other two held her. He said, "I told you to keep your mouth shut. So now you will get what you looked for." He called her a "kike," a "prostitute," and said she belonged on the street as a "working girl" for Latvians. He also threatened to do it again if she told anyone. Petitioner did not tell anyone, revealing it for the first time in the statement in support of her asylum application.

We agree that one of the inconsistencies identified by the IJ concerning the rape—that petitioner said the rapist lived "two doors" away and then said he lived "two houses" away—was not material to her claim. However, the IJ found two other inconsistencies. Specifically, petitioner testified that the rape occurred on October 21, 1993, but told the asylum officer that it happened in the spring of 1993. Also, petitioner testified that she had last seen her rapist on the day of the rape in 1993. She changed her testimony, however, when reminded that she told the asylum officer that she continued to see Artis, who would laugh and try to block her path, and that she last encountered him in 2002. These inconsistencies about when the rape occurred and whether petitioner last saw her rapist in 1993 or continued to see and be harassed by him until 2002, did go to the heart of her claim of past persecution.

Two later incidents were also relied upon by petitioner. First, in 2001, she and her mother were home when three men they did not know entered the house, forced them to kneel, and bound her mother's mouth and hands before kicking her. The men called them

"dirty Jews" and told her mother to "get away before it was too late." After they left, petitioner's mother called the police, but the police would not open a case because there was not enough evidence. Petitioner testified that her parents continued to live and work in Latvia, and her mother had not suffered any harm since the attack in 2001.

Second, petitioner testified that while walking home from her Jewish school in the winter of 2002, two men, one in a leather jacket and the other in police uniform, began following her. When she stopped, one kicked her in the stomach. They said Jews did not have any business being there. Petitioner testified that she lost consciousness and saw a doctor the following day, who told her she had a "concussion of the internal organs." She was prescribed pain medication and was told to stay in bed for two weeks. Petitioner said she did not report the assault to the police because her parents did not believe the police would do anything about it. Acknowledging that she did not have any record of the doctor's visit, petitioner explained that there was "no system over there as far as medical reports."

In testifying regarding this assault, however, petitioner did not mention that the assault was related to a car accident that preceded it. When reminded that she had told the asylum officer about the accident, petitioner acknowledged that the other driver had worked for the police department, accused her of being at fault in the accident, and called her repeatedly before the assault insisting that she take the blame for the accident. She refused, the assault followed, and a court case related to the accident was not resolved until late in 2003. Omission of the fact that the assault was preceded by and related to a dispute over a car accident involving someone who worked for the police seems calculated to bolster

petitioner's claim of persecution on account of her religion or ethnicity.

As the BIA noted, when doubts arise concerning credibility, "corroborating evidence becomes particularly important in meeting the alien's burden of proof." *See Pilica v. Ashcroft*, 388 F.3d 941, 945 (6th Cir. 2004); *see also Berri v. Gonzales*, 468 F.3d 390, 395-96 (6th Cir. 2006). "[E]ven when an applicant's credibility has not been questioned, the failure to provide reasonably available corroborating evidence" can constitute grounds for concluding that an applicant has failed to meet her burden of proof. *Shkabari*, 427 F.3d at 331. The BIA found that petitioner had not produced corroborating evidence of any of the events or even of her Jewish ethnicity, despite the opportunity to do so while in Latvia and the fact that she had regular contact with her parents in Latvia. Except for evidence of the alleged rape, which petitioner says she did not tell anyone about, petitioner's failure to provide any corroborating evidence supports the IJ's adverse credibility determination.

Petitioner testified that her birth certificate showed that she was Jewish. When the IJ pointed out that it did not, petitioner explained that her parents had wanted to shield her from persecution. The IJ also found that petitioner's passport, issued in 1998, did not indicate that she is Jewish, even though the International Religious Freedom Report stated that "prior to 2002, regardless of the bearers wishes all passports listed the bearers ethnicity on the front bio page as Latvian, Russian, or Jewish." (Emphasis added.) Also, despite knowing that she planned to seek asylum in the United States, petitioner did not collect documents that would corroborate her testimony while she was in Latvia for the last time. Nor did petitioner obtain statements from her parents corroborating her claims until after the merits hearing was

completed. The IJ concluded that even petitioner's claim to be Jewish was not supported by any objective evidence. Further, the IJ found that the Country Reports from 2003 and 2006 did not support her claim of societal discrimination against Jews in Latvia.

Petitioner testified that all of her Jewish friends had emigrated from Latvia because it was so difficult to be Jewish there. Petitioner did not want to return to Latvia, saying that she feared for her life and the lives of her parents and son if she returned. The evidence showed that petitioner graduated with a degree in management theory from the University of Latvia in 2003, and traveled to a number of other countries in her work for the university. Petitioner's parents continued to live in Latvia without further incident, and petitioner returned to Latvia to put her affairs in order.

We find that substantial evidence supports the adverse credibility determination, as well as the finding that even if credible petitioner's testimony failed to demonstrate past persecution, or a reasonable fear of future persecution, on account of a protected ground as is required to establish eligibility for asylum. As a result, petitioner also cannot demonstrate the "clear probability of persecution" required for withholding of removal under the INA. *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005). Nor does the record compel a finding that petitioner would "more likely than not" be subjected to torture if removed to Latvia, as would be required to obtain relief under the CAT. *Mapouya v. Gonzales*, 487 F.3d 396, 418 (6th Cir. 2007).[3]

---

[3]Contrary to petitioner's assertions, the Country Reports do not support the contention that the Latvian government inflicts, instigates, or acquiesces in the torture of Jews. 8 C.F.R. § 1208.18(a)(1) (defining torture to include the intentional infliction of pain and suffering "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity").

**III.**

Finally, petitioner contends that the IJ's rejection of the late-filed exhibits denied her due process right to formulate and argue a claim for humanitarian asylum. A due process violation results from the exclusion of evidence when "the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." *Hassan v. Gonzales*, 403 F.3d 429, 436 (6th Cir. 2005) (internal quotation marks and citation omitted). Claims of due process violations in removal hearings are reviewed *de novo*. *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998).

Petitioner does not dispute, and the record is clear, that the proffered documents concerning the evaluation of petitioner's minor son were not filed more than 14 days before the merits hearing as required by the local rules. Nor is there any claim that these exhibits qualified for exception to the 14-day filing rule on the grounds that the evidence was new or previously unattainable. All documents to be considered must be filed with the immigration court, and the IJ may set a time frame for filing any applications, related documents, and responses. 8 C.F.R. § 1003.31(a) and (c). If a document is not filed within this time frame, the opportunity to do so is waived. *Id*. Rejection of these documents consistent with established time limits did not violate petitioner's due process rights. *See*, *e.g.*, *Hassan*, 403 F.3d at 435-36 (denying due process claim based on exclusion of untimely proffered letter).

The petition for review is **DENIED**.