**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0022n.06

No. 08-4293

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Jan 13, 2010**
LEONARD GREEN, Clerk

DRITA PERLASKA,
    *Petitioner*,

v.

ERIC H. HOLDER, JR.,
    *Respondent*.

On Petition for Review from a
Final Order of the Board of Immigration
Appeals, Agency No. A078 529 945

_____

Before: KENNEDY, MOORE, and WHITE, Circuit Judges.

**KENNEDY, J.** Petitioner Drita Perlaska appeals an order of the Board of Immigration

Appeals ("Board" or "BIA") denying her applications for asylum, withholding of removal, and

protection under the regulations promulgated pursuant to section 242(b) of the Foreign Affairs

Reform and Restructuring Act of 1998, which implement the United States' obligations under the

Convention Against Torture ("CAT"). For the reasons set forth below, we DENY Perlaska's petition

for review.

**FACTUAL AND PROCEDURAL BACKGROUND**

Petitioner, an ethnic Albanian, is a native of the former Yugoslavia and a citizen of Kosovo.[1]

On or about April 20, 2000, Petitioner sought admission into the United States by way of San

_____

[1]The government states in its brief that Petitioner is a citizen of Serbia and Montenegro.
Presumably, this is because at the time of Petitioner's merits hearing before the immigration judge,
Kosovo had not yet been recognized by the United States as an independent country. However, on
February 18, 2008, the United States recognized Kosovo as an independent nation.

Ysidro, California, after presenting immigration officials with an altered Austrian passport. Perlaska was denied admission and placed in the custody of the former Immigration and Naturalization Service. On April 22, 2000, an immigration official conducted an airport interview of Perlaska, in which she made a sworn statement indicating that she and her family suffered persecution in Serbia. On May 2, 2000, an asylum officer conducted a credible fear interview of Perlaska, in which she again made a sworn statement as to past instances of persecution. On May 9, 2000, Perlaska was issued a Notice to Appear that charged her with removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I) for failure to possess a valid entry document at the time of her entry into the United States. Petitioner successfully moved for a change of venue to Detroit, Michigan, where she was given a January 19, 2007, merits hearing before an immigration judge. Prior to the hearing, on October 5, 2006, Petitioner filed a motion requesting that the immigration judge assigned to the case recuse herself from the proceedings on the ground that the judge previously served as Chief Counsel for the Department of Homeland Security while Petitioner's case was pending. The immigration judge denied the motion, however, and specifically noted that–although thousands of cases came across her desk–she did not have any direct or indirect contact with Perlaska's case, nor did she ever provide advice or assistance to any members of the DHS staff regarding the case.

At the merits hearing on January 19, 2007, Perlaska testified on her own behalf and recounted several instances of alleged past persecution. One involved the death of one Mikel Marku, whom Petitioner claims is her maternal grandfather. According to Petitioner, on October 31, 1991, Marku and two cousins of Petitioner were together in a car when they were stopped and arrested by Serbian police. They were then detained for over twenty-four hours and were beaten by the officers. Upon

2

being released from custody, Marku was admitted to a hospital and died soon thereafter.  Perlaska admitted that she did not witness any of these events but was told about them by her cousins.

Petitioner next testified that on March 27, 1999, she and her grandmother–with whom Petitioner was living at the time–were forced out of their home by Serbian police and paramilitary forces.  After their entire village was forced out of their homes, the Serbian forces divided the men and women into separate lines.  While Petitioner was standing in line, four Serbian soldiers pulled her into a nearby wooded area.  Petitioner initially testified that two of the men held her while another cut off her clothes and then threw her to the ground.  She screamed for help but was hit on the head by one of the men, rendering her unconscious.  The next thing she remembered was lying in her grandmother's lap on the back of a tractor that was heading to a refugee camp.  Upon additional questioning by the immigration judge, however, Perlaska testified that one of the men got on top of her and said he was going to rape her, and also that she felt pain in her vaginal area before she became unconscious.  In her written asylum application, Petitioner stated that she told no one about the rape other than her husband.  At one point in her testimony, however, she stated that the only people she told about the incident were her husband and also a doctor in New York who examined her after arriving in the United States.  At another point in her testimony, she stated that she revealed the rape to doctors who were on site at the refugee camp.

Finally, Perlaska testified that she feared returning to Kosovo because "all kinds of things" could happen were she to return.  She stated that most of her family has since moved to the United States.  Her father was granted asylum by the United States on April 11, 1996.  He subsequently filed derivative asylum applications for his immediately family members.  All were granted asylum except Petitioner, who had reached the age of 21 and was not entitled to be claimed as a derivative of her

3

father. Perlaska testified that her grandmother was still alive and living in Kosovo with Petitioner's uncle.[2]

In addition to testifying at the merits hearing, Petitioner also submitted several items of documentary evidence to support her claim. She submitted a letter from the psychiatrist in New York who examined her. The letter described Perlaska's account of her "traumatic experiences" in Kosovo, including the rape, and concludes that her "very serious psychic disability" is due to those traumas. Perlaska also submitted general reports on the violence in the Kosovo province, as well as pictures of damage done to the home Perlaska had shared with her grandmother. Perlaska also submitted documentary evidence corroborating the death of Mikel Marku. Finally, Perlaska submitted a witness list that included the names of most of her relatives now living in the United States. None of these witnesses actually testified, however; Perlaska's was the only testimony offered to the immigration judge.

At the end of the hearing, on January 19, 2007, the immigration judge denied Perlaska's applications for asylum, withholding of removal, and protection under the Convention Against Torture. On the same day, the IJ also issued an order and oral decision containing a detailed analysis of her reasons for denying Perlaska's applications. The judge first found that Perlaska was not credible. In making this determination, the judge relied on numerous inconsistencies and omissions she found between the various statements Perlaska had made since arriving in the United

---

[2]Petitioner also testified that in 1990, Serbian police threw tear gas inside the school that Petitioner and her cousins attended. None of them was in the school when this occurred, but Petitioner did not attend school again after this incident. The relevance of this story (and Petitioner's testimony about it) is limited, however, because the IJ did not rely on it to make her adverse credibility determination, and Petitioner does not rely on it to bolster her claim that the IJ's credibility determination was in error.

States–specifically her airport interview and credible fear interview with immigration officials, her written applications, and her testimony at the merits hearing. The IJ then listed in substantial detail each of the inconsistencies and omissions that weighed in favor of her adverse credibility finding.

With respect to the events surrounding the death of Mikel Marku, the judge noted that although Perlaska testified that her two cousins were also arrested and beaten during the incident, Perlaska made no reference to her cousins being arrested and beaten during the credible fear interview. With respect to Perlaska's alleged deportation from Serbia, the judge noted that Perlaska had been inconsistent as to when the deportation actually occurred: she stated in her credible fear interview that the deportation occurred on March 27, 1999, but testified at the merits hearing that it occurred on March 22, 1999. Additionally, the judge found that Petitioner's statements were inconsistent as to what took place during the forced deportation. The judge pointed to the fact that in her credible fear interview, Perlaska claimed that, before leaving the house, she dressed herself to look like an old lady so as not to attract any attention. However, in her testimony at the hearing, initially, she simply stated that she grabbed a bag and a jacket and then left the house.[3] Finally, the judge noted that Perlaska claimed in her credible fear interview that she was beaten with a stick by Serbian soldiers as she left her house, yet she made no such claim during her merits hearing testimony.

The immigration judge also found significant discrepancies in Petitioner's statements about her passport. In her airport interview, Perlaska claimed her passport had been burned in Kosovo during the war. Then, in her credible fear interview, she claimed that Serbian police officers had

---

[3]Later in her testimony, Perlaska did say that she dressed like an old woman to avoid attention. However, she made this statement only after being reminded by her attorney that she had made this claim in her credible fear interview.

5

confiscated her passport and other identification documents.  In her written asylum application, however, Perlaska provided a copy of her passport and admitted that she had fabricated the prior stories.  In her testimony at the merits hearing, Perlaska admitted to the lie again.

The immigration judge also noted inconsistencies in Perlaska's statements regarding her family members.  At the merits hearing, Perlaska testified that she had two relatives in Kosovo who were still alive: her grandmother and her uncle.  In her airport statement, however, she claimed that her grandmother had died in Kosovo and that she had no other family members left in that country.  Although Perlaska attempted to explain the discrepancy in her testimony by saying that her grandmother was in fact dead to her because she knew about the rape, the immigration judge found the explanation unconvincing.

The immigration judge also noted inconsistencies in Perlaska's statements with respect to why she wanted to be in the United States.  In her initial statements to immigration officials, Petitioner claimed that she was not afraid to return to Kosovo and only came to the United States to be with her family.  Yet, in her testimony to the immigration judge, she explained that she came to the United States because of fear that she would be harmed if she stayed in Kosovo.

Finally, the immigration judge noted inconsistencies with respect to Perlaska's alleged rape.  The most critical discrepancy was that Perlaska did not mention her alleged rape during her airport interview and credible fear interview.  The judge also found that the story itself, as told by Perlaska during her testimony at the merits hearing, contained substantial inconsistencies.  For example, she first testified that a man cut off her clothes, she was thrown to the ground, she was hit in the head, she fell unconscious, and she next remembered lying with her grandmother in the tractor with ripped clothes and blood on her body.  In response to questioning from the immigration judge, however,

6

Perlaska stated that the man who threw her to the ground said that he was going to rape her, that she had seen the man getting on top of her, and that she felt pain in her vaginal area, all before she lost consciousness. Many of these details were not in Petitioner's written application and none were contained in any of her previous statements to immigration officials. The immigration judge thus concluded that Perlaska had adjusted her testimony in an attempt to explain how she could have known that she was in fact raped.

After making her adverse credibility determination, the immigration judge then evaluated and rejected the documentary evidence Perlaska provided to corroborate her testimony. In particular, the judge noted that: 1) the evidence of Mikel Marku's death did not prove he was related to Perlaska; and 2) none of the witnesses on Petitioner's witness list ended up testifying on her behalf, despite the fact that they all currently reside in the United States. Therefore, the IJ ruled that the corroborating evidence was insufficient to overcome her adverse credibility finding and that Perlaska consequently had not met her burden of showing entitlement to asylum.[4]

On September 15, 2008, the BIA affirmed the immigration judge's adverse credibility finding and denial of asylum, withholding of removal, and CAT protection. In affirming the IJ's adverse credibility finding, the Board relied on several of the findings made by the IJ: the inconsistency as to the cousins' altercation with the police, the circumstances surrounding Perlaska's passport, the inconsistencies regarding the details of the rape, and Perlaska's failure to corroborate her story with

---

[4]The immigration judge also found that, even if Petitioner's lack of credibility and corroborating evidence were overlooked, asylum would still be denied on the ground that the government showed that conditions had changed in Kosovo, which effectively rebuts any presumption Petitioner might have had regarding her fears of future persecution. The judge's determination as to this issue, however, is not relevant to this appeal because the BIA did not reach this issue.

7

other evidence. The Board explained that these inconsistencies went to the heart of Petitioner's claim and were sufficiently specific and cogent to support the IJ's adverse credibility determination. The Board also affirmed the IJ's decision not to recuse herself, noting that the IJ never had any contact with the case and that Petitioner had failed to show or even attempt to show prejudice arising from the judge's continued handling of the case.

This appeal followed.


**DISCUSSION**

**I. Due Process Claim–Failure to Recuse**

A. Standard of Review

Petitioner first argues that her due process rights were violated when the immigration judge refused to recuse herself from the removal proceedings. Because the Board in this case, after reviewing the immigration judge's decision, issued an independent opinion as to the recusal denial, we will review the decision of the Board as the final agency determination. *See, e.g.*, *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007). Legal conclusions, such as whether or not Petitioner has proven her due process claim, are reviewed de novo. *See Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998).


B. Analysis

Although Perlaska is entitled to due process in her removal proceedings, *see Castellano-Chacon v. INS*, 341 F.3d 533, 553 (6th Cir. 2003), she has not shown how the immigration judge's refusal to recuse herself amounted to a due process violation. "Reviewing an alleged due process

8

violation is a two-step inquiry: first, whether there was a defect in the removal proceedings; and second, whether the alien was prejudiced because of it." *Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005). As to the first inquiry, both parties note in their briefs that an immigration judge has an obligation to recuse herself when she has "served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy." 28 U.S.C. § 455(b)(3). Perlaska points to the fact that the immigration judge, prior to her judicial appointment, had worked in the Department of Homeland Security ("DHS") as Chief Counsel while Perlaska's removal proceedings were pending. But there is nothing in the record to suggest that the judge, while at DHS, ever participated in Perlaska's case in any of the capacities listed in the statute. Furthermore, the immigration judge specifically stated in her decision on the recusal motion that she never had any direct or indirect contact with Perlaska's case while she was at DHS. Petitioner's only response is that "[e]ven if it is not contained in the record, Petitioner nor her counsel could be assured that another attorney had not come to [the judge] during [her DHS tenure] and consulted with her regarding the case." However, the judge's prior holding of this position does not in itself prove that she had any involvement in the case. *Abdulahad v. Holder*, 581 F.3d 290, 296 (6th Cir. 2009); *see also Petrov v. Gonzales*, 464 F.3d 800, 803 (7th Cir. 2006) ("The Chief Counsel of a large [government immigration] office is unlikely to play any role in routine decisions of this kind."). Petitioner has the burden of proof here to show that there was in fact a defect in the proceedings; the mere possibility of one is not sufficient to show actual constitutional error.

In a separate attempt to show an actual procedural defect, Petitioner points to the fact that the immigration judge "interrupted counsel in his line of questioning" with questions of her own that

9

were "adversarial in nature." Immigration judges, however, have "broad discretion in conducting" removal proceedings. *Castellano-Chacon*, 341 F.3d at 553. Furthermore, immigration judges are statutorily authorized to "interrogate, examine, and cross-examine the alien and any witness." 8 U.S.C. § 1229a(b)(1); *see Abdulahad*, 581 F.3d at 296. Petitioner points to no precedent or anything in the record to indicate that the judge's questions amounted to an abuse of this discretion or to some independent due process violation.

Finally, Petitioner has also failed to show any prejudice from these alleged defects. Petitioner fails even to argue on appeal the she was prejudiced by them.[5] Without a showing of actual prejudice, we cannot say that Petitioner has successfully made out her due process claim even if we were to find a constitutional error on the part of the immigration judge. Accordingly, we deny Perlaska's petition as to her due process claim.

## II. Asylum Claim

A. Standard of Review

The Board also issued its own ruling on Perlaska's asylum claim. Accordingly, we treat it as the final agency determination. To the extent that the Board adopted the reasoning of the immigration judge, however, we will review both the decision of the Board and the decision of the immigration judge. *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005). Factual determinations, including adverse credibility determinations, are reviewed under the "substantial evidence" standard. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). Under this deferential standard

---

[5]Petitioner also failed to show or even attempt to show prejudice in her brief to the Board of Immigration Appeals.

10

of review, the Board's decision must be affirmed if it is "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Mullai v. Ashcroft*, 385 F.3d 635, 638 (6th Cir. 2004) (quoting *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001)). "We are not entitled to reverse 'simply because [we are] convinced that [we] would have decided the case differently.'" *Id.* (quoting *Adhiyappa v. INS*, 58 F.3d 261, 265 (6th Cir. 1995)). Instead, the agency's findings are "conclusive" unless "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008). In other words, "'in order to reverse the BIA's factual determinations, the reviewing court must find that the evidence not only supports a contrary conclusion, but indeed *compels* it.'" *Mullai*, 385 F.3d at 638 (quoting *Klawitter v. INS*, 970 F.2d 149, 152 (6th Cir. 1992)).

B. Analysis

To be eligible for asylum, an alien bears the burden of establishing that he or she is a "refugee" as Congress has defined that term for the purposes of asylum determinations. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (citing 8 U.S.C. § 1158(a)). According to the relevant statute, a "refugee" is a person outside of his or her country of nationality who is unable or unwilling to return to that country "because of persecution or a well-founded fear of persecution on account of" one or more of five possible grounds: "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Under this standard, the applicant must show that he or she has a well-founded fear of future persecution or that he or she suffered actual persecution in the past. *Mullai*, 385 F.3d at 638. A showing of past persecution entitles an alien to a rebuttable presumption that he or she has a well-founded fear of future persecution. *Id.*; 8 C.F.R.

11

§ 208.13(b)(1). That presumption can often be rebutted, however, if the government shows that conditions in the alien's home country have changed. *See, e.g.*, *Liti v. Gonzales*, 411 F.3d 631, 639 (6th Cir. 2005).

An applicant's own testimony, if credible, can be sufficient in and of itself to support an asylum application. *See Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004). Thus, in cases where the applicant testifies on his or her own behalf, the immigration judge's determination of the applicant's credibility is not only important but can be dispositive.[6] Although we review this determination under the deferential "substantial evidence" standard, the IJ must at least provide specific and cogent reasons for its adverse credibility finding. *Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006) (citing *Sylla*, 388 F.3d at 926). Affirmative inconsistencies, as well as omissions, may form the basis of an adverse credibility determination, so long as they are "substantially related to the asylum claim." *Liti*, 411 F.3d at 637 (internal citations omitted). But an adverse credibility finding cannot be based entirely on minor discrepancies that do not "go to the heart of the case."[7] *Sylla*, 388 F.3d at 926. In other words, "[i]f discrepancies cannot be viewed as attempts by the

---

[6]Indeed, the testimony of the applicant is often the principal evidence, or the only evidence, in asylum cases. Logically, the more crucial the testimony of the applicant is to the resolution of the case, the more important the credibility determination becomes. *See, e.g.*, *Gjolaj v. Keisler*, No. 06-3877, 2007 WL 3104800, at *3 (6th Cir. Oct. 23, 2007) (noting importance of credibility determinations).

[7]Congress' enactment of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302, changed this standard. Now, an IJ can base an adverse credibility determination on any inconsistencies, "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor." 8 U.S.C. § 1158(b)(1)(B)(iii); *see also El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009). However, this new standard only applies to applications for asylum, withholding of removal, or other such relief that were filed on or after May 11, 2005. *See El-Moussa*, 569 F.3d at 256. Because Perlaska's application was filed before this date, the pre-REAL ID Act standard still applies to her case.

applicant to enhance his claims of persecution, they have no bearing on credibility." *Id.* (internal citations and quotation marks omitted). If an immigration judge does make an adverse credibility finding, the judge may require corroborating evidence to justify granting asylum. *See* 8 U.S.C. § 1229a(c)(4)(B).

*1) Credibility Determination*

In its review of the IJ's adverse credibility finding, the Board specifically relied on three of the inconsistencies identified by the IJ among Perlaska's various statements. First, there are inconsistencies in the record with respect to Perlaska's alleged rape. As noted above, Petitioner did not even mention the rape to immigration officials during either the airport interview or the credible fear interview. Perlaska first indicated that she had been raped when she amended her asylum petition on the day of her hearing before the IJ. Then when she testified to the incident during the merits hearing, her account contained some inconsistencies with respect to what happened, how she knew she was raped, and whom she told about the assault. Second, Perlaska gave untruthful statements regarding the whereabouts of her passport. She stated first that it had been burned during the war, and later that it had been confiscated by police. Finally she admitted that nothing had happened to it and that it was in her possession all along. Third, regarding the events surrounding her grandfather's death, Perlaska did not mention the presence of her cousins (and the fact that they, too, were beaten by police) in her brief credible fear interview. She did, however, note her cousins' presence during the more thorough merits hearing.

Though we do not necessarily agree with the Board that all of these discrepancies are substantial and go to the heart of Perlaska's claim, we cannot conclude that any reasonable

13

adjudicator would be compelled to find that Perlaska is credible. *See Singh v. Ashcroft*, 398 F.3d 396, 402 (6th Cir. 2005) (court not compelled to find petitioner credible where "several of the grounds upon which the IJ relied are somewhat questionable," but two central inconsistencies were legitimate). Two discrepancies in particular – 1) the fact that Perlaska did not mention the rape until the date of her hearing and 2) the fact that Perlaska lied twice upon entering the country about her passport being destroyed – lend support to the IJ's credibility determination.

Perlaska offers several reasons why these discrepancies should be disregarded. She claims that her post-traumatic stress disorder explains her reluctance to reveal the fact of the rape and the details of it. Perlaska also points out that she had been in jail for more than a week before her credible fear interview, making it reasonable that she did not provide exhaustive detail concerning events which caused her trauma and fear. However, we are not reviewing the facts de novo or making our own determination as to Perlaska's credibility and overall asylum merit. We only determine whether there is substantial evidence on the record as a whole to support the immigration judge's finding in these respects. *See Ivezaj v. INS*, 84 F.3d 215, 220 (6th Cir. 1996). Thus, even if Perlaska's explanations for failing to mention the rape are reasonable, we cannot conclude that the IJ could not weigh the omission in determining Perlaska's credibility. *Compare Koulibaly v. Mukasey*, 541 F.3d 613, 624 (6th Cir. 2008) (adverse credibility determination not clearly erroneous where petitioner failed to mention being beaten in her asylum application). The same is true with regard to Perlaska's lies about her passport. And, because these discrepancies go to the heart of Petitioner's claim, we cannot rule that any reasonable adjudicator would be compelled to rule differently.

*2) Corroborating Evidence*

Perlaska also challenges the ruling by the Board that her failure to call corroborating witnesses who were available weighed against her with respect to her credibility and underlying burden of proof. We note first that the Board was within its rights to consider the lack of such corroborating evidence where the IJ found that her testimony was not credible. *See Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004) (affirming an alien's failure to provide corroborating evidence as "further support" for adverse credibility finding); *see also Steinberga v. Holder*, No. 08-4260, 2009 WL 3644628, at *3 (6th Cir. Nov. 2, 2009) ("[W]hen doubts arise concerning credibility, corroborating evidence becomes particularly important in meeting the alien's burden of proof." (internal quotation marks and citations omitted)). Petitioner argues that the Board was wrong to weigh against her the failure to call the witnesses on witness list that she provided. According to Perlaska, her witnesses did not testify only because they did not have personal knowledge of the facts about which she testified. Petitioner's argument, however, fails to address the Board's concern. The problem is that no one testified on behalf of Petitioner to corroborate her claims, not that she created a list of witnesses who did not end up testifying. Petitioner also relies on a letter written by the New York psychiatrist who examined her that describes Perlaska's account of her "traumatic experiences" in Kosovo, including the rape, and concludes that her "very serious psychic disability" is due to those traumas. The relevance of this document is somewhat limited, however, because the doctor could not corroborate Perlaska's allegations of persecution–allegations of which he has no personal knowledge. Finally, Petitioner also submitted documents describing the past violence in Serbia, the pictures showing the damage done to the home she formerly shared with her grandmother, and the asylum applications of Perlaska's father, mother, and two brothers that confirm her relationship to

Mikel Marku. Even if this evidence is helpful to Perlaska's petition, we cannot say that it is sufficient, in light of the discrepancies in her statements, to convince us that a reasonable adjudicator would have been *compelled* to rule differently.

## 3) Rebuttable Presumption

In its decision to dismiss Perlaska's appeal, the Board opted not to address the IJ's alternative ruling that the government had also proven country conditions have changed, thereby rebutting the presumption that Petitioner has a well-founded fear of future persecution upon return to Kosovo. We also find it unnecessary to reach this issue because the BIA did not rely on this theory and because the issue has not been briefed to this Court.

## CONCLUSION

For the foregoing reasons, we DENY Perlaska's petition for review.